Mark Miller (#9563)
Brett Foster (#6089)
Tamara L. Kapaloski (#13471)
**DORSEY & WHITNEY LLP**
111 S. Main Street, Suite 2100
Salt Lake City, UT 84111
Telephone: (801) 933-7360
Facsimile:  (801) 933-7373
miller.mark@dorsey.com
foster.brett@dorsey.com
kapaloski.tammy@dorsey.com

Mike Keyes (*admitted pro hac vice*)
**DORSEY & WHITNEY LLP**
701 Fifth Avenue, Suite 6100
Seattle, WA 98104-7043
Telephone: (206) 903-8800
Facsimile: (206) 903-8820
keyes.mike@dorsey.com

*Attorneys for Plaintiff Instructure, Inc.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **INSTRUCTURE, INC.**, a Delaware corporation,<br><br>      Plaintiff,<br><br>vs.<br><br>**CANVAS TECHNOLOGIES, INC.**, a Delaware corporation, ,<br><br>      Defendant. | **PLAINTIFF INSTRUCTURE INC.'S MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Civil No. 2:21-cv-00454-DAK-CMR<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Cecilia M. Romero |

Pursuant to Fed. R. Civ. P. 65 and 15 U.S.C. § 1116, Plaintiff Instructure, Inc. ("Instructure"), by and through counsel, respectfully requests that the Court enter a Preliminary Injunction (a Proposed Order is attached) enjoining Defendant Canvas Technologies, Inc.'s ("Canvas Tech") ongoing infringement of Instructure's trademark.

## I.     INTRODUCTION

"How are y'all gonna steal another company's product name?" asked one consumer after Canvas Tech (f/k/a Jumpstart) announced its rebrand to "Canvas," a well-known mark owned by Instructure. In response, another consumer quipped: "Seriously, not to mention that the other product is also a website/app for students." These consumers raise a good question. Why would Jumpstart rebrand to Canvas, a well-known federally registered mark that Instructure owns and has been using for over a decade? Perhaps one commentator answered this question best in congratulating Canvas Tech's CEO, Ben Herman, on the rebrand: "Canvas[,] one word, two syllable brand and better yet scoring the canvas.com domain, dude, that's a f***ing jackpot." Mr. Herman understood the crucial importance of a brand and felt "restrained" by "Jumpstart." He set his sights on a "big, more relatable brand" that "had the level of trust, authenticity and magnitude of vision that we had for the company." The Canvas mark fits that bill because Instructure has poured tens of millions into building its Canvas mark over the past decade. Over 30 million users connect to Instructure's Canvas platform, which is one of the top 20 most visited websites in the U.S. The Canvas mark is big, relatable, and has the level of trust Jumpstart craved. Presented with the opportunity to also seize the canvas.com domain, Jumpstart could not resist the temptation to hit the "Canvas" jackpot, and trade off the goodwill and name recognition Instructure had built in the Canvas mark, despite Instructure's prior trademark rights.

Instructure's attempts to dissuade Canvas Tech from infringing its mark resulted only in Canvas Tech resorting to machinations at the USPTO in a misguided and fruitless attempt to gain instant trademark rights in "Canvas." As a result, Instructure has no choice but to seek immediate redress from this Court to stop Canvas Tech from stealing Instructure's mark and trading on the

goodwill that it painstakingly acquired over more than a decade. Unless enjoined, Canvas Tech's infringement is likely to cause widespread confusion and irreparable harm to Instructure and is adverse to the public interest. Preliminary injunctive relief is warranted here.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Instructure Owns Federal Registrations for the Canvas Mark.

On April 1, 2010, Instructure filed an intent-to-use trademark application with the United States Patent and Trademark Office ("USPTO") to register CANVAS as a mark. *See* Daly Decl. at ¶4.[1] On January 3, 2012, the USPTO issued to Instructure U.S. Registration No. 4,080,698 (the "'698 Registration") on the Principal Register for the CANVAS mark based on this application. Exh. 1. The '698 Registration has become incontestable. Daly Decl. at ¶4.[2]

On May 22, 2012, Instructure filed with the USPTO another application to register CANVAS as a mark. *Id*. at ¶5. On April 25, 2017, the USPTO issued to Instructure Reg. No. 5,191,435 (the "'435 Registration") on the Principal Register for the CANVAS mark based on this trademark application. *Id*.; Exh. 2. Instructure's '698 Registration and '435 Registration and Canvas trademarks will be collectively referred to as the "Canvas Registrations," and the "Canvas Mark" or "Canvas Marks" respectively.

### B.   Instructure Introduces Canvas to the Public in June of 2010.

In June of 2010, Instructure publicly introduced Canvas, Instructure's online learning management system ("LMS"). *See* Daly Decl. at ¶6; Exh. 3. A news story from June 20, 2010,

---

[1] References to "Daly Decl." are to the Declaration of Steve Daly submitted herewith. References to "Exh." are to the exhibits attached to the Daly Decl.

[2] Where a registration is incontestable, it "shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b).

explained that Canvas "allows the online part of education to be just as Web savvy as its users." Exh. 3 at 1. Canvas stood out from other LMS on the market in 2010 because it integrated with other internet tools, such as Google Docs, YouTube, or student-owned blogs. *Id*. Canvas also allowed greater user interconnectivity and engagement by providing a platform for students to start discussion groups and post questions. *Id*. Users could also exchange comments and post webcams and YouTube videos. *Id*. As Canvas's co-founder explained "students have this appetite . . . . They just want to be more engaged with their education, they want[] to know what was going on, not just while they were in class." *Id*. Thus, since its public debut in June of 2010, Canvas has provided an online platform for students and educators to upload, post, display, and share information.

### C. Instructure Rapidly Expands Its Canvas Services To Showcase Students' Achievements to Potential Employers.

Shortly after launching, Instructure expanded the services it offers beyond a strict LMS platform. *Id*. at ¶¶7-30. In 2010, Instructure began offering its users the ability to collect and showcase their educational projects, submissions, experiences, and other work product in Canvas ePortfolios that could be shared with future employers. *Id*. at ¶7. Years ago, Instructure also added its Canvas Community. *Id*. at ¶17. This Community allows its 1.35 million members, comprised of administrators, designers, instructors, parents, and students, to share, collaborate, and shape the Canvas product through community forums and content repositories. *Id*. at ¶13. In 2019, Instructure also began offering its Canvas Portfolium services. *Id*. at ¶20. This service allows users to showcase their education and work accomplishments and connect with other professionals. *Id*. Through this service, Canvas users can also follow companies they are interested in, upload resumes, references, and other skills and qualifications, and discover and apply for jobs. *Id*.

**D.      Instructure Has Invested Heavily In the Canvas Mark and Has Continuously Used It for Over a Decade.**

Since its debut in June of 2010, Instructure has continuously and prominently used the Canvas Mark. *Id*. at ¶31. Instructure invests substantial resources in promoting and advertising the Canvas Mark, and has expended tens of millions of dollars in advertising expenditures related to the mark since 2010. *Id*. Instructure's Canvas Mark has been heavily advertised online. *Id*. at ¶32. For example, Instructure has published 1,365 YouTube videos advertising its Canvas products, many of which have been viewed tens of thousands or hundreds of thousands of times. *Id*. at ¶33. Instructure has advertised its Canvas Mark in magazines (*id*. at ¶35), listing programs (*id*.), television ads (*id*.), trade shows (*id*. at ¶¶36-38), brochures (*id*. at ¶39), and billboards (*id*. at ¶¶ 40, 54). Most, if not all, of these ads prominently feature the Canvas Mark and specifically tie Canvas to the services offered by Instructure. *Id*. at ¶¶31, 33, 37-41, 43, 54; Exhs. 10-11. Instructure's efforts and accomplishments have contributed to its reputation and goodwill, making Instructure's Canvas Mark a well-known and recognized name across the globe. *Id*. at ¶45.

**E.      The Canvas Mark is Widely Known by Millions of Canvas Users.**

Instructure has gone to extraordinary lengths to promote a connection in the public's mind between the Canvas Mark and Instructure's Canvas products, and it has succeeded. By February of 2011, at least 26 educational institutions were operating on the Canvas platform. *Id*. at ¶46. By October of 2012, the number of educational institutions on Canvas had grown to over 300, with more than 4.5 million users connecting to Canvas. *Id*. at ¶47. In 2017, Canvas surpassed 15 million users globally. *Id*. at ¶48. In 2018, Instructure's Canvas LMS achieved the enviable position of being the top market share holder in the U.S. LMS market. *Id*. at ¶49. It has maintained this status as the paid market share leader in the U.S. through today. *Id*. In 2019, Instructure's Canvas

platform surpassed 20 million users globally. *Id*. at ¶ 50. In 2020, thirteen states across the U.S. adopted Instructure's Canvas platform across the states' educational institutions, and schools in all 50 states currently use Canvas in some capacity. *Id*. at ¶51; Exh. 17. In recent months, Instructure's Canvas website has been among the top 20 most visited websites in the U.S. *Id*. at ¶52.

Instructure's Canvas platform has 30 million users globally, with millions of these users in the U.S. *Id*. Instructure's Canvas Community boasts 1,349,719 members, and nearly 400,000 posts have been published on the Canvas Community. *Id*. Canvas has 48,300 followers on Twitter, nearly 22,700 followers on Facebook, and nearly 4,000 Instagram followers. *Id*. at ¶32. Canvas has its own app on the Apple store, which is rated #9 in education apps and has nearly 2 million user ratings. *Id*. at ¶52. Instructure has hosted a CanvasCon event for several years. *Id*. CanvasCon was held virtually in 2020 due to the COVID-19 pandemic and had nearly 20,000 attendees. *Id*. Instructure's Canvas products have received numerous third party awards over the past decade. *Id*. at ¶¶41-44. As shown by consumer comments regarding Canvas Tech's rebrand, when consumers hear "Canvas," they think of Instructure's Canvas. Exhs. 25-27.

Today, Instructure's diverse Canvas platform serves as a connection hub for students, educators, administrators, parents, content providers, businesses, employers, and recruiters. Daly Decl. at ¶52. The Canvas platform currently has over 6,000 customers, representing Higher Education institutions, including all of the Ivy League universities in the U.S., and K-12 districts and schools in more than 90 countries. *Id*. In July of 2021, Instructure announced its proposed $250 million IPO with giant billboards in New York City's Times Square that prominently displayed the Canvas Mark. *Id*. at ¶54.

**F.      In June of 2017, Jumpstart Launched an Online Platform to Connect Students with Employers.**

In or around June of 2017, Jumpstart Ventures, Inc. ("Jumpstart") launched an online platform at www.jumpstart.me. *Id.* at ¶61. As shown by the following screenshot, Jumpstart's platform sought to connect students with potential employers:



*Id.* at ¶62. Jumpstart offered these services to students under the "Jumpstart" mark:

 *Id.* Jumpstart began as a technology-driven way to connect employers with a much larger pool of students than traditional on-campus recruiting permitted. As explained by Jumpstart's VP of Marketing:

> "a lot of university recruiting was happening on campus. And that meant it was very limited. You can only go to a certain number of schools, it was very hard to go nationwide . . . . by turning this entire process virtual even pre-COVID, we were able to connect recruiters with talent all over the country. . . . So essentially, we started building this diversity recruiting product for university recruiters."

Exh. 23. Thus, from the outset, Jumpstart targeted college students; *i.e.*, many of the very same students using Instructure's Canvas platform. A news article reported that as of December 18, 2019, Jumpstart had 100,000 students on its platform. Exh. 18.

**G.      By the End of 2020, Jumpstart Felt Restrained by the Jumpstart Mark and Began Working on a Rebrand.**

Jumpstart CEO, Ben Herman, understands the crucial importance of a mark in a company's success. In his own words, "the best advice" someone could get when starting a company is to "spend more time on the brand, the name, . . . . I think that stuff is actually more important than

the idea itself." Exh. 21 at 3. Toward the end of 2020, Jumpstart realized it had a problem with its Jumpstart brand. According to Mr. Herman, "we don't believe that our name [Jumpstart] and domain [jumpstart.me] reflected our vision and our brand awareness and trust that we had built." *Id*. Mr. Herman wanted "a name and brand that enables us to build something as big as our vision." *Id*. As a result, Jumpstart began "working on a big rebrand." *Id*. at 2.

## H.    In May of 2021, Jumpstart Rebranded to Canvas, a "Big, More Relatable Brand."

On May 24, 2021, Jumpstart publicly announced $20 million in new funding and its rebrand to "Canvas." Exh. 19. At the same time, Jumpstart redirected its www.jumpstart.me website to www.canvas.com. Daly Decl. at ¶64.[3] In a news story published on May 26, 2021, one commentator recognized the significance of Canvas Tech's move to the www.canvas.com domain:

> "Jumpstart's rebrand to Canvas also sees the company move to the incredible Canvas.com domain name. In terms of digital branding, that is an enormous step up from jumpstart.me, and cements an instant sense of trust, legitimacy, and legacy."

Exh. 20. Another commentator noted that "a domain like that just brings instant credibility to any business." Exh. 21 at 3. Mr. Herman agreed: "Yeah, that was our goal." *Id*.

During a June 23, 2021, interview, Mr. Herman explained the rebrand and the acquisition

---

[3] Despite the near ubiquity of the Canvas mark, Instructure does not own the www.canvas.com domain. Since the late 1990s, the canvas.com domain has been owned by Branded Holding Group, LLC ("BHG"). *Id*. at ¶¶56-57. Until recently, BHG has simply parked the canvas.com domain with no content. *Id*. In 2012, BHG, through its owner Roland Chemtob, offered to sell the canvas.com domain to Instructure. *Id*. at ¶58. Due to the unreasonably high price and terms being demanded, Instructure declined to purchase the domain. *Id*. Mr. Chemtob approached Instructure again about the canvas.com domain in 2013 and 2016, with the same result. *Id*. at ¶59. Most recently, during October of 2020, BHG and Instructure engaged in further negotiations regarding the canvas.com domain. *Id*. at ¶60. Although those negotiations similarly broke down after Instructure declined to pay the exorbitantly high price BHG demanded for the domain, Instructure cautioned BHG that it should not sell the domain to anyone operating in similar channels with similar services to Instructure's Canvas-branded platforms. *Id*.

of canvas.com as follows:

> "Jumpstart . . . never really had the level of trust, authenticity and magnitude of the vision that we had for the company. And we realized it didn't kind of allow us to expand our horizons and we felt pretty restrained by the [jumpstart.me] domain. So we wanted a big, more relatable brand . . . . And, I had great access to the [canvas.com] domain through a mutual friend. . . . Canvas.com's never been used, it's always been parked. My, you know, friend introduced me to someone who, you know, is really well-respected when it comes to domains. . . . And so [I] connected with this guy and we hit it off and spent the last year talking about how we could make something work and already great dough that made it worthwhile."

Exh. 22 at 3. Without doubt, Roland Chemtob of BHG is the "guy" that Mr. Herman "hit it off" with and spent the last year talking to about the canvas.com domain. *See* Exh. 21 at 3 (In another interview Ben Herman stated that "one of my friends who I was introduced to a year or two ago, held this [canvas.com] domain with many others and we were able to strike a great deal."). Thus, BHG was negotiating with both Jumpstart and Instructure for the canvas.com domain at the same time. Daly Decl. at ¶¶60, 70. Although Canvas Tech has not disclosed the amount it paid for the canvas.com domain, Mr. Herman admitted during an interview that it was at least a six-figure purchase. Exh. 21 at 3. Based on Instructure's previous negotiations with BHG and details disclosed to Instructure during October of 2020, at the same time as BHG was negotiating with Jumpstart, Instructure believes that Canvas Tech paid well over $1 million for the domain.

Canvas Tech paid a steep price to acquire the canvas.com domain and rebrand to Canvas, which it undoubtedly knew was a well-known mark owned by Instructure. As one commentator exclaimed during an interview with Canvas Tech CEO, Ben Herman:

> "Very nice, Very nice. First and foremost, Ben congrats on the new funding and the new brand because I guarantee you, your sales and marketing staff would probably kiss you on the mouth[] [i]f you were actually in the office, jumpstart.me was pretty easy, but Canvas one word, two syllable brand and better yet scoring the canvas.com domain, dude, that's a [f***ing] jackpot." *Id*.

Exh. 22 at 7. Clearly, Canvas Tech agreed.

### I.      Consumers Immediately Began Commenting On How Jumpstart was Piggy-Backing Off Instructure's Goodwill.

The significance of Defendant's rebranding to Canvas, a well-known and widely published

and used mark owned by Instructure, was not lost on consumers. Shortly after the rebrand, Canvas

Tech published an announcement on its community platform announcing the name change:



Exh. 25. In response, one Canvas user commented as follows:



*Id*. Other Canvas users commented as follows:

Exh. 26.  These consumers' expressed apprehension over the rebrand to Instructure's Canvas

Mark was well-founded. As shown below, there are significant similarities and points of overlap

between Instructure's and Canvas Tech's respective Canvas platforms.

**J.      Instructure and Canvas Tech Offer Similar Services to Overlapping Consumers on their Respective Canvas platforms.**

In a blog post announcing its rebrand, Canvas Tech explained that "we want a name and brand that represents how big our mission is . . . Canvas is where you can show who you really are and get hired for it."  Exh. 24 at 7-8. At the time of Jumpstart's rebrand to Canvas and acquisition of the canvas.com domain in May of 2021, Instructure had already been operating its online platform under its federally registered Canvas Mark for *eleven years* offering many of the same services to the same target audience.

Canvas Tech's Canvas platform offers university students and job seekers the ability to "show who you are." Daly Decl. at ¶77. This is the exact same service that Instructure offers with its Canvas ePortfolios product: an online portfolio to showcase students' achievements, projects, educational experience and skills (*Id.* at ¶¶7-8, 77) and its Canvas Portfolium product: online skills portfolio and recruiting system to assist and guide students in showcasing their achievements to employers (*Id.* at ¶20-29, 78-79). Thus, Canvas Tech offers the same services to the same users under the identical Canvas Mark.

**K.      Canvas Tech Improperly Attempts to Acquire Instant Trademark Rights.**

After learning about Canvas Tech's rebranding and adoption of Instructure's Canvas Mark, Instructure sent a cease and desist letter to Canvas Tech on June 2, 2021. Exh. 29. Instructure formally advised Canvas Tech of Instructure's trademark rights in Canvas and attached Instructure's Canvas Registrations. *Id*. Thus, at least as early as June 2, 2021, Canvas Tech had actual notice of the Canvas Registrations. Thereafter, Canvas Tech and Instructure engaged in discussions about a resolution that would include Canvas Tech rebranding and ceasing its use of

the Canvas mark. Daly Decl. at ¶90.

To Instructure's great disappointment, as the parties were exploring a possible resolution that would avoid litigation, Canvas Tech was secretly looking for a way to circumvent Instructure's prior rights in the Canvas Mark. On or about July 13, 2021, *after* Canvas Tech received Instructure's June 2 cease and desist letter and *after* Canvas Tech had actual knowledge of Instructure's Canvas Registrations, Canvas Tech supposedly acquired through "assignment" trademark Registration No. 4,737,811 for the following mark (the "'811 Registration"):



Exhs. 30-31. The original registrant of the '811 Registration is an individual by the name of Ms. Colby Smith. *Id*. Ms. Smith's "canvas" mark is an acronym for "Concierge Alliance Napa Valley And Sonoma." The mark "consists of the word 'canvas' in lower case lettering with the wording 'concierge alliance napa valley & sonoma' below within brackets. (the "Canvas Acronym Mark").[4] Exh. 31. The '811 Registration is largely related to conducting trade shows in the field of hotel, food service, hospitality, and concierge services. *Id*. The description of goods covered by the '811 Registration does not cover the platform offered by Canvas Tech. *Id*. Further, it appears from Ms. Smith's website that her business has largely marketed itself as "Concierge Alliance" and provides services related to the wine hospitality industry in California. *See* www.conciergealliance.com.

On July 2, 2021, exactly one month after Instructure sent its cease and desist letter to Canvas Tech, Ms. Smith suddenly filed with the USPTO a new application to register "Canvas"

---

[4] The acronym for Ms. Smith's wine hospitality business began as CANV because she was only in Napa Valley. Exh. 33. Ms. Smith later added "AS" after incorporating Sonoma ("And Sonoma"). *Id*.

(Exh. 32), which she also assigned to Canvas Tech (Exh. 30). This application appears to have been written strategically to cover the services provided by Canvas Tech under the Canvas mark for the first time in 2021. Exh. 32. It is apparent that Canvas Tech acquired the Canvas Acronym Mark and Ms. Smith's new application only in a misguided attempt to gain instant trademark rights in Canvas in response to Instructure's June 2 letter.

## III.   LEGAL ARGUMENT

### A.   Standard for Preliminary Injunctions.

To obtain preliminary injunctive relief, the party seeking a preliminary injunction must satisfy a four-factor test. "The requesting party must demonstrate: (1) that it has a substantial likelihood of prevailing on the merits; (2) that it will suffer irreparable harm unless the preliminary injunction is issued; (3) that the threatened injury outweighs the harm the preliminary injunction might cause the opposing party; and (4) that the preliminary injunction if issued will not adversely affect the public interest." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). Instructure can make this showing and preliminary injunctive relief is required here to preserve Instructure's well-established trademark rights.

### B.   Instructure is Likely to Succeed on its Trademark Infringement Claims.

To succeed on its trademark infringement claim, Instructure must establish that it is (1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark. *Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Res.*, 527 F.3d 1045, 1049 (10th Cir. 2008). Instructure can establish both of these elements.

First, Instructure is the owner of all rights in and to the Canvas Marks, which are registered on the Principal Register and are used in connection with Instructure's goods and services. Exhs.

1-2. The Lanham Act creates a statutory presumption of protectability for registered marks. *See ICON Health & Fitness, Inc. v. Med. Prods*., No. 10-cv-207-DN, 2012 WL 3962737, at \*3 (D. Utah Sept. 11, 2012) (citing 15 U.S.C. § 1115(a)). Moreover, Instructure's '698 Registration has become incontestable, which is conclusive evidence of validity, ownership, and the exclusive right to use the mark in commerce. 15 U.S.C. § 1115(b). Accordingly, the first element is met.

With respect to the second element, the Tenth Circuit considers six non-exhaustive factors to evaluate likelihood of confusion: (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) the similarity of the parties' products and the manner in which they market them; (5) the degree of care that consumers are likely to exercise in purchasing the parties' products; and (6) the strength of the mark. *Sally Beauty Co., Inc. v. Beautyco, Inc*., 304 F.3d 964, 972 (10th Cir. 2002). "These six factors are interrelated and no one factor is dispositive." *Water Pik, Inc. v. Med-Sys., Inc*., 726 F.3d 1136, 1143 (10th Cir. 2013). "At all times the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks." *Id*. Here, each of these factors weighs in favor of finding a likelihood of confusion.

### 1.    The Parties' Canvas Marks are Identical.

The similarity of the marks is the "first and most important factor." *Hornady Mfg. Co. v. Doubletap, Inc*., 746 F.3d 1001 (10th Cir. 2014). The degree of similarity is tested on three levels as encountered in the marketplace: sight, sound, and meaning. *Id*. Here, there is no visual difference between the competing marks (*i.e.*, they are both "Canvas"). Further, the parties' marks are sometimes accompanied by a similar circular logo at the left-hand side of the mark:

  

Courts have found much less similar marks than these to be "so similar they are likely to cause confusion." *See Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1246 (D. Utah 2020). A mark's "sound" refers to pronunciation. Here, the marks are pronounced in the exact same way. With respect to meaning, the marks are also identical as the marks employ the exact same word. Thus, this important factor strongly favors Instructure.

### 2. Canvas Tech Intended to Trade On the Popularity of Instructure's Canvas Mark When It Chose to Rebrand as Canvas.

"Although a showing of actual intent to confuse and mislead . . . is not required to obtain equitable relief . . . the intent of the party adopting the allegedly infringing mark is an important element in determining whether the confusing similarity standard has been met." *Marker Int'l v. DeBruler*, 635 F. Supp. 986, 999 (D. Utah 1986), *aff'd*, 844 F.2d 763 (10th Cir. 1988). "The proper focus when determining intent is whether the defendant had the intent to derive benefit from the reputation or goodwill of the plaintiff." *Icon Health & Fitness, Inc. v. Nautilus Group, Inc.*, No. 1:02-cv-109-TC, 2004 U.S. Dist. LEXIS 31511, at *13 (D. Utah Dec. 21, 2004) (citation omitted). "Defendant's intent to bask in the reflected popularity of plaintiff's name is significant in a trademark infringement action in that it creates a presumption that the name chosen will in fact infringe upon plaintiff's mark." *Marker Int'l*, 635 F. Supp. at 999 (cleaned up). "When a defendant intentionally uses the trademark of another it is presumed he did so in order to cause confusion between his products and those of the one holding the trademark." *Id*.

Canvas Tech elected to continue to use the Canvas mark *after* being informed by Instructure of its Canvas Registrations on June 2, 2021. Exh. 29. Most tellingly, after receiving Instructure's June 2 cease and desist letter and after being on actual notice of the Canvas Registrations, Canvas Tech led Instructure to believe it was amenable to rebranding to buy time

while Canvas Tech brazenly acquired Ms. Smith's wine-related Canvas Acronym Mark and her newly-filed trademark application in an unlawful (and futile) attempt to gain instant trademark rights and circumvent Instructure's Canvas Registrations. Thus, this factor strongly favors Instructure.

Moreover, Canvas Tech did not randomly choose "Canvas." It deliberately chose to use an *identical* copy of Instructure's Canvas Mark. Canvas Tech's intention was crystal clear: "we felt pretty restrained by [jumpstart.me] . . . we wanted a big, more relatable brand." Exh. 22 at 3. Instructure has painstakingly built its Canvas Mark into a big (nearly ubiquitous in its markets) brand over the past eleven years that is very relatable to its 30 million users. Daly Decl. at ¶¶31-52. Thus, the Canvas Mark has the "level of trust, authenticity and magnitude of vision" that Jumpstart wanted. Exh. 22 at 3. There can be no real question under these circumstances that Canvas Tech intended to "bask in the reflected popularity of plaintiff's name," which "creates a presumption that the name chosen will in fact infringe upon plaintiff's mark." *Marker Int'l*, 635 F. Supp. at 999 (enjoining defendant's use of plaintiff's name and logo).

There is also no question that Jumpstart knew of Instructure's Canvas mark during its rebrand. During the fall of 2020, BHG was *simultaneously negotiating with both Jumpstart and Instructure* for the canvas.com domain. Daly Decl. at ¶¶60, 70. Although BHG did not disclose the Jumpstart name to Instructure during the negotiations, it did advise Instructure that "a sequoia backed company" was also negotiating for canvas.com at the same time and provided details of those negotiations. *Id*. at ¶70. During its year-long negotiations with Jumpstart, BHG undoubtedly

disclosed to Jumpstart details of its negotiations with Instructure as a bargaining chip.[5] Thus, the fact that both companies were negotiating for the canvas.com domain *at the same time* strongly supports the inference that Jumpstart knew of Instructure's Canvas Mark, which in turn "support[s] a finding of intentional copying." *Sara Lee Corp. v. Sycamore Family Bakery*, No. 2:09-cv-523-DAK, 2009 U.S. Dist. LEXIS 100554, at *10 (D. Utah 2009) (granting preliminary injunction).

### 3. Consumer Reactions to the Rebrand Evidence a Substantial Likelihood It Will Create Confusion.

"Although a party need not set forth evidence of actual confusion in order to prevail in a trademark-infringement action, actual confusion in the marketplace is often considered the best evidence of likelihood of confusion." *Icon Health,* 2004 U.S. Dist. LEXIS 31511, at *14. "But, because evidence of actual confusion can be difficult to obtain, its absence is generally unnoteworthy and is given little probative weight." *Id.* (cleaned up).

As shown above, immediately upon announcing its rebrand, several Jumpstart users questioned Jumpstart's decision to rebrand to Canvas. One user recognized that Jumpstart was "just steal[ing] another company's name." Exh. 26. *See also* Exh. 25 ("Canvas is the name of an online learning platform."). Instructure also had a lead directly advise it that "another company is using the name Canvas for their website[.] You can check it out at canvas.com." Exh. 27. This indicates that Canvas Tech's use of an identical mark for overlapping services targeted to similar users is likely to cause confusion. *See Sara Lee Corp.*, 2009 U.S. Dist. LEXIS 100554, at *11-12 ("Despite the inherent difficulty of finding instances of actual confusion for a . . . product . . . that has only been sold in the market for a few months, Sara Lee has proven several instances of actual

---

[5] This is especially likely given the proclaimed "friendship" between Mr. Herman and Mr. Chemtob, BHG's owner. *See* Exh. 21 at 3 (Ben Herman refers to Mr. Chemtob as a "friend.").

confusion. . . . This evidence further supports a finding of infringement.). Thus, the evidence of actual confusion factor also favors Instructure.

### 4. The Parties Offer Overlapping Services on Their Canvas Platforms and Market them in a Similar Manner.

"The greater the similarity between the [parties'] products, the greater the likelihood of confusion." *Sally Beauty Co*., 304 F.3d at 974. This factor is analyzed by considering (1) the similarity of products, and (2) the similarity in how the products are marketed. *Id*. "The issue is not whether the goods and services can be distinguished from each other in some aspect, but instead it is whether consumers would believe that one entity produced both." 5 *Gilson on Trademarks* § 5.05 (citations omitted). Here, there is considerable overlap in the parties' services in at least 3 specific ways:

<u>**(1) Canvas ePortfolio:**</u> Instructure began offering its Canvas ePortfolios in 2010, *eleven years before* Canvas Tech began offering its online recruitment platform under the Canvas mark. Daly Decl. at ¶7. Canvas ePortfolios, which are tied to a user's profile and not to a specific course, can be made public and permit users to collect and showcase accomplishments and other information and to share it with future employers. *Id*. at ¶¶7-8. Instructure's ePortfolios are accessed from within users' Canvas accounts (*id*. at ¶16), and Instructure has promoted its ePortfolio services as Canvas products and under the Canvas Mark (*id*. at ¶9-10). Consumers recognize Instructure's ePortfolio services as Canvas products and use the Canvas Mark when describing the ePortfolios. *Id*. at ¶¶11-15; Exhs. 4-6.

<u>**(2) Canvas Portfolium**</u>:   In 2019, *three years before* Canvas Tech began offering its services under the Canvas mark, Instructure added Canvas Portfolium to its services. *Id*. at ¶20. Canvas Portfolium is a platform to showcase users' work experience to colleagues and potential

employers and to connect with other professionals. *Id*. at ¶¶20-23; Exh. 7. Through this service, Canvas users can follow companies they are interested in, upload resumes, references, and other skills and qualifications, and discover and apply for jobs. *Id*. The Canvas Portfoliums are searchable by employers. *See* portfolium.com/students. Instructure currently touts over 40,000 recruiters that use its Canvas Portfolium platform. *Id*. Instructure has promoted Portfolium as a Canvas product using the Canvas Mark (*id*. at ¶¶24-29). Consumers recognize Instructure's Portfolium services as a Canvas product and use the Canvas Mark when describing them. *Id*. at ¶21, 79; Exhs. 8, 28.

Thus, Instructure's Canvas ePortfolio and Canvas Portfolium provide nearly identical services (*i.e.*, a platform for showcasing higher education students' accomplishments and connecting students with potential employers) to identical audiences (*i.e.*, employers and higher education students) as Canvas Tech's Canvas platform. There is without doubt significant overlap between Instructure's Canvas users and Canvas Tech's Canvas users, as indicated by the user comments regarding Canvas Tech's rebrand. Exh. 26 ("the other product is also a website/app for students").

**(3) Canvas Community**:  In addition to providing similar services to the same users, both Canvas platforms provide a "Community" where users interact with and learn from each other, post questions and comments, and gather information. Instructure's Canvas Community, which has over 1,349,000 members, is for "Canvas users sharing, collaborating, and shaping Canvas together." Daly Decl. at ¶18. Similarly, Canvas Tech's "Canvas talent community" allows its members to ask questions, learn from seasoned mentors, and network:

 

*See* Daly Decl. at ¶¶82-83.

Users of both Canvas platforms are represented similarly graphically by icons containing the user's picture, name, and title. *See id.* at ¶85. Part of both Canvas platforms' touted mission is to "align" respective users with job opportunities and to help users promote themselves to future employers. *See id.* at ¶¶80-81. Both platforms provide resources for their members that are graphically represented by visually similar clickable icons. *Id.* at ¶86. The login screens for both Canvas platforms are highly similar visually, using a circular design next to the Canvas mark, and both invite users to join by asking if users "Need a Canvas account?". *Id.* at ¶87.

The parties' respective Canvas platforms provide the same services, target the same group of higher education students about to enter the job market and potential employers, and are visually similar. Instructure's Canvas ePortfolio, Portfolium, and Community services allow students to upload, post, show, display, tag, blog, and share or otherwise provide electronic media or information over the internet, the precise category of services covered by the Canvas Registrations. *See* Exhs. 1-2. Canvas Tech provides a platform with an identical name and identical services. As the similarities and crossover in the Canvas platforms indicate, and as the comments reproduced above from Canvas users reveal, Canvas Tech's use of the Canvas Mark creates a substantial likelihood of consumer confusion.

As for the manner of marketing, users (both employers looking for higher education students and recent grads and students) are highly likely to come across both parties' services while online. *Id*. at ¶76. Indeed, without doubt, many students simultaneously use both parties' platforms and many are likely to wrongly presume that Canvas Tech's platform is owned, sponsored by, or otherwise affiliated with Instructure's long-established Canvas platform. *Id*. Because there is substantial overlap in both the parties' services and in their manner of marketing, this factor also weighs strongly in favor of Instructure.

### 5.   Degree of Care Exercised by Consumers.

Consumers are less likely to exercise care and more likely to be confused with inexpensive products. *See, e.g., Beer Nuts, Inc. v. Clover Club Foods Co*., 711 F.2d 934, 941 (10th Cir. 1983). The users of the parties' respective Canvas platforms do not pay for them—they are purchased and implemented by Universities and companies, such that the users are simply provided the service by these institutions. Therefore, because the user population does not shop for, compare, and actually purchase the services, they are less likely to exercise much care in distinguishing between the parties' platforms such that the use of the exact same name—Canvas—is likely to lead to confusion. *Id*. ("Buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse."); *see also Online Tools for Parents, LLC v. Vilsack*, 65 F. Supp. 3d 1130, (D. Colo. 2014) (finding recipients/users of free educational materials to be "unsophisticated or … unlikely to vigorously compare the marks" since "both products/services are provided for free"). This factor also strongly favors Instructure.

### 6.   The Canvas Mark is Conceptually and Commercially Strong.

The strength of the Instructure CANVAS mark is important because "[t]he stronger the

mark, the greater the likelihood that encroachment on the mark will produce confusion." *Sally Beauty*, 304 F.3d at 976. In determining strength, the Court must assess conceptual strength (*i.e.*, the placement of the mark on the distinctiveness spectrum) and commercial strength (*i.e.*, the marketplace recognition value of the mark). *See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1093 (10th Cir. 1999).

As to conceptual strength, marks are placed in one of five categories, ranging from weakest to strongest: generic, descriptive, suggestive, arbitrary, and fanciful. *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004). The Tenth Circuit has described the five categories as follows:

> A mark is generic if it is a common description of products or services and refers to the genus of which the particular product or service is a species. A mark is descriptive if it describes the product's or service's features, qualities, or ingredients in ordinary language or describes the use to which the product or service is put. A mark is suggestive if it merely suggests the features of the product or service, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods or services. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.

*Id.* (cleaned up).

Here, the Canvas Mark is properly categorized as either arbitrary or suggestive, as the mark bears no relationship to the actual products (*e.g.*, LMS, Community, ePortfolios, Portfoliums). Rather, the Canvas Mark is evocative of a strong cloth used to make items such as sails, tents, and surfaces for painting. Whether arbitrary or suggestive, the Canvas Mark is "inherently distinctive" and entitled to "the greatest protection." *Id*.

From a commercial perspective, the Canvas Mark is also strong. To evaluate commercial strength, courts consider (1) the length and manner of the mark's use, (2) the nature and extent of advertising and promotion of the mark, and (3) the efforts made to promote a conscious connection,

in the public's mind, between the mark and a particular product." *Hornady Mfg.*, 746 F.3d at 1007. An evaluation of these factors leads to the overwhelming conclusion that Instructure's Canvas Mark is commercially strong.  First, the Canvas Mark has been on the market for 11 years. Daly Dec. at ¶¶6, 8-15, 18-19, 21, 24-29, 31-45, 54. Instructure publicly debuted the mark in June of 2010 and has continuously used and advertised the mark since then. *Id.*

Second, Instructure has spent tens of millions of dollars advertising its Canvas products since 2010. *Id.* at ¶31. Instructure's Canvas products have been advertised under the Canvas Mark online, in magazines, on television channels, at trade shows, on multiple websites, and on billboards. *Id.* at ¶¶33, 40, 52, 54. Nearly every brochure, guide, and manual issued over the past 10 years by Instructure has prominently displayed Instructure's Canvas mark. *Id.* at ¶39; Exhs. 10-11.

Third, Instructure has succeeded in creating an association in the public's mind between the Canvas Mark and Instructure's Canvas products. Instructure's website which prominently displays the Canvas Mark and products is one of the top 20 most visited websites in the U.S. *Id.* at ¶52. Instructure's Canvas platform has 30 million users globally. *Id.* Instructure's Canvas Community boasts 1,349,719 members. *Id.* Canvas has 48,300 followers on Twitter, nearly 15,000 followers on Facebook, and nearly 4,000 Instagram followers. *Id.* at ¶32. Canvas's app is rated #9 in education apps and has nearly 2 million user ratings. *Id.* at ¶52. Nearly 20,000 consumers attended Instructure's virtual 2020 CanvasCon. *Id.* Canvas has also received numerous third party awards over the past decade. *Id.* at ¶¶41-44. Consumer comments regarding Canvas Tech's rebrand reveal that when consumers hear "Canvas," they think of Instructure's Canvas. Exhs. 25-27.

Instructure's Canvas Mark is conceptually and commercially strong and this factor heavily

favors Instructure. Because every likelihood of confusion factor favors Instructure, Instructure is highly likely to succeed on the merits of its trademark infringement claim.[6]

### C.     Instructure is Entitled to a Presumption of Irreparable Harm.

Effective December 27, 2020, the Trademark Modernization Act modified 15 U.S.C. § 1116, which relates to injunctive relief in trademark actions. *See* Pub. L. 116-260, § 226, 134 Stat. 2208 (2020). Congress inserted an additional sentence into the statute: "A plaintiff seeking any such injunction **shall be entitled to a rebuttable presumption of irreparable harm** . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for preliminary injunction or temporary restraining order." 15 U.S.C. § 1116(a) (emphasis added). Because Instructure is likely to prevail on the merits as shown above, it is entitled to a presumption of irreparable harm.

### D.     The Balance of Hardships Favors Granting a Preliminary Injunction.

"When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l Inc. v. Reed Elsevier, Inc*., 866 F. Supp. 585, 587-88 (D.D.C. 1994). This is because, "[o]ne who adopts the marks of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived." *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992). "[W]hen the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a

---

[6] Instructure is also likely to succeed on its false designation of origin claim under 15 U.S.C. § 1125. A plaintiff bringing a claim under 15 U.S.C. § 1125 must show: (i) a protectable interest in the mark; (ii) that the defendant used an identical or similar mark in commerce; and (iii) that defendant's use of the mark is likely to confuse consumers as to the source of the goods. *See 1-800 Contacts, Inc. v. Lens.com, Inc*., 722 F.3d 1229, 1238 (10th Cir. 2013). This test is identical to the test for trademark infringement. *See Utah Lighthouse*, 527 F.3d at 1049. Because the Canvas Mark is registered, and Instructure has established a likelihood of success on the merits of its trademark claim, it is also likely to prevail on this claim.

business built upon that infringement." *GMC v. Urban Gorilla, LLC*, 500 F.3d 1222, 1229 (10th Cir. 2007). Thus, "courts afford little weight to self-inflicted harms when conducting the balancing inquiry." *Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1255. When Canvas Tech rebranded to Canvas, it undoubtedly knew that Instructure already operated in a substantially similar space under the Canvas Mark, but chose to rebrand to Canvas anyway. Thus, Canvas Tech "assumed the risk" it took when it rebranded to the Canvas Mark. *Id*.

By contrast, Instructure stands to suffer great harm by Canvas Tech's continued use of Canvas. Instructure has marketed and sold its services under the Canvas Mark since June of 2010. It has invested tens of millions of dollars in promoting products sold under its mark. Instructure would be significantly harmed if Canvas Tech is permitted to trade off the goodwill and reputation that Instructure has painstakingly built over the past decade. *See Harris Research, Inc. v. Lydon*, 505 F. Supp. 2d 1161, 1168 (D. Utah 2007) (finding threatened injury to Plaintiff outweighs the harm caused to Defendants in light of "Plaintiff's considerable investment in its trademark"). Moreover, Instructure is seeking a limited order from the Court requiring Canvas Tech to sop infringing Instructure's trademark, which it has only been using for a few months. Instructure is not requesting that Canvas Tech no longer promote and sell its services. The harm to Canvas Tech, when compared with the damage to the reputation of Instructure and its investment in its product and brand, is minimal.

### E. Enjoining Canvas Tech from Unlawfully Infringing on Instructure's Mark Serves the Public Interest.

"Infringement and dilution of trademarks are inherently contrary to the public interest." *Harris Research,* 505 F. Supp. 2d at 1169 (granting preliminary injunction). "Public interest in fair competition dictates that Defendant should not be allowed to profit off the efforts of Plaintiff in

achieving commercial success." *Kodiak Cakes LLC v. Cont'l Mills, Inc*., 358 F. Supp. 3d 1219, 1237 (D. Utah 2019) (granting preliminary injunction). "The public interest also disfavors allowing competition at the expense of consumer confusion." *Id.* "[P]rotecting the rights of the owner of a registered trademark is consistent with the public interest because trademarks foster competition and promote the maintenance of quality in business." *Delta Western Group, L.L.C. v. Ruth U. Fertel, Inc*., No. 2:00-cv-45-C, 2000 WL 33710852, at *8 (D. Utah Sept. 28, 2000) (granting preliminary injunction). "This factor normally weighs in favor of the issuance of an injunction because the public interest is the interest in upholding trademark protections." *Id*. Accordingly, this factor favors enjoining Canvas Tech's unlawful infringement.

## IV.   THIS COURT SHOULD ONLY REQUIRE NOMINAL SECURITY.

The Tenth Circuit has held that "a trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction, if there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp. v. Transwestern Pipeline*, 825 F.2d 1461, 1462 (10th Cir. 1987) (citation omitted). In this case, strong evidence proves infringement. The Tenth Circuit in *Gen. Motors* informs the Court's analyses: "when the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement." 500 F.3d at 1229. Here, Canvas Tech cannot claim harm because the case for infringement is clear. No bond is required. *See e.g.., Continental Oil v. Frontier Refining Co*., 338 F.2d 780, 782-83 (10th Cir. 1964) (affirming preliminary injunction with no bond in the absence of proof showing a likelihood of harm if a bond is not issued).

## V.   CONCLUSION

Instructure's motion should be granted and the Court should enter an order enjoining Canvas Tech's use of "CANVAS," or any confusingly similar name, including the use of canvas.com.

 DATED this 17th day of August, 2021.          Dorsey & Whitney LLP


                                               By: /s/ *Tamara L. Kapaloski*
                                               Mark Miller (#9563)
                                               Brett Foster (#6089)
                                               Mike Keyes (admitted pro hac vice)
                                               Tamara L. Kapaloski (#13471)

                                               *Attorneys for Plaintiff Instructure, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of August, 2021, a true and correct copy of the foregoing document was served on counsel of record via CM/ECF.


*/s/ Tamara L. Kapaloski*