# EXHIBIT 5

<u>TRADEMARK ACQUISITION AGREEMENT</u>

     This **TRADEMARK ACQUISITION AGREEMENT** (hereinafter referred to as the "Agreement") is made and entered into as of this 13th day of July 2021 ("Effective Date"), by and between Colby Smith, a California resident with an address at P.O. Box 2267, Yountville CA 94599 (hereinafter referred to as "Seller"), and Canvas Technologies, Inc., a Delaware corporation having a principal place of business at 55 Second Street, Suite 1925, San Francisco, CA 94105 (hereinafter referred to as "Buyer"). Both Seller and Buyer are collectively referred to herein as the "Parties."

<u>RECITALS</u>

     **WHEREAS**, Seller owns the trademarks CANVAS, CANVAS (Stylized) **canvas**, and CANVAS [CONCIERGE ALLIANCE NAPA VALLEY & SONOMA] (Stylized) canvas, and has individually and/or through its related company, Concierge Alliance, LLC (a business owned and controlled solely by Seller) used such trademarks since 2010 in connection with the provision of networking services, training and educational programs, educational information, newsletters, trade shows, and consumer outreach services, all via communications channels including magazines and websites and in-person events, in interstate commerce throughout the United States (collectively, the "CANVAS Marks");

     **WHEREAS**, at least as early as 2013, Seller began using the CANVAS Marks in connection with an online, interactive job board for the recruiting of human resources, and for facilitating communication between employers and job applicants throughout the United States and internationally;

     **WHEREAS**, Seller on April 25, 2014 applied for and obtained U.S. Trademark Reg. No. 4737811 for the mark CANVAS [CONCIERGE ALLIANCE NAPA VALLEY & SONOMA] (Stylized) canvas in connection with "[c]onducting trade shows in the field of hotel, food service, hospitality, and concierge services; conducting, arranging and organizing trade shows and trade fairs for commercial and advertising purposes; membership club services, namely, providing on-line information to members in the fields of branding, business development, business marketing, and marketing; organizing, promoting and conducting exhibitions, tradeshows and events for business purposes" in Class 35 (the "CANVAS Registration");

     **WHEREAS**, Seller on July 1, 2021 file U.S. Trademark Application Ser. No. 90/808,387 for the mark CANVAS (Word) in Class 35 for "Providing business information via a web site; Conducting trade shows in the field of hotel, food service, hospitality, and concierge services; Conducting, arranging and organizing trade shows and trade fairs for commercial and advertising purposes; Membership club services, namely, providing on-line information to members in the fields of branding, business development, business marketing, and marketing; Organizing, promoting and conducting exhibitions, tradeshows and events for business purposes" (claiming

first use as early as September 1, 2010), as well as. "Employment recruiting services; Employment hiring, recruiting, placement, staffing and career networking services" (claiming first use as early as July 18, 2013); and in Class 42 for "Providing a website featuring technology that enables job applicants to submit applications for employment to companies, and for employers to solicit and accept applications for employment;  Providing an interactive website for online recruiting of human resources and for communication among employers and candidates for employment" (claiming first us as early as July 18, 2013) as well as "Providing a website featuring educational information in field of hotel, food and beverage, hospitality, wineries and concierge services" (claiming first use as early as September 1, 2010) and, together with the CANVAS Marks and the CANVAS Registration, the "CANVAS Marks and Filings");

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of Seller's right, title, and interest in and to the CANVAS Marks and Filings and related rights, together with the goodwill associated therewith and symbolized thereby, subject to the terms and conditions set forth herein; and

**WHEREAS**, Buyer desires to grant a license back to Seller, and Seller desires to accept a license from Buyer to use the CANVAS Marks and Filings and related rights in connection with the goods and services for which Seller has previously used the CANVAS Marks and Filings, subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows.

1.     **Purchase of Trademarks**. Seller hereby irrevocably sells, assigns, and transfers to Buyer, and Buyer hereby accepts and assumes from Seller, all of Seller's rights, title, and interest in, to and under:  (a) the CANVAS Marks, together with the goodwill associated therewith and symbolized thereby; (b) the CANVAS Filings; (c) all rights, claims, and causes of action with respect to any of the foregoing, whether accruing before, on, or after the Effective Date, including all rights to any claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement or dilution; (d) all other rights, privileges and defenses of Seller in relation to the CANVAS Marks and Filings, including without limitation rights to cancel trademark registrations and oppose trademark applications of third parties, provided by any applicable law, treaty, or other international convention throughout the world with respect to any of the foregoing (collectively, the "Acquired Rights").

2.     **Purchase Price and No Assumption of Liabilities**.

(a)     Buyer agrees to pay to Seller fifty-seven thousand U.S. dollars [U.S. $57,000] (the "Purchase Price").

(b)     Buyer shall pay the Purchase Price within five (5) business days following the Parties' full execution of this Agreement and the Transaction Documents (defined below).

Payment shall be made in U.S. dollars by wire transfer to the specific account identified by Seller in a separate email to Buyer subsequent to full execution of this Agreement.

(c)    Other than the Acquired Rights, Buyer is not purchasing, and Seller is not selling, any other assets of Seller. Buyer is not assuming and shall not be liable for any pre-closing liability or obligation of Seller, whether known, unknown, existing, contingent on future events, accrued, funded, unfunded, or otherwise.

**3.    Deliverables.**  Concurrent with the execution of this Agreement, the Parties shall deliver to each other the following:

(a)    A trademark assignment agreement duly executed by Seller in the form attached as Exhibit A hereto, transferring all of Seller's rights, title, and interest in and to the Acquired Rights ("Assignment Agreement"); and

(b)    A trademark license agreement executed by Buyer in the form attached as Exhibit B hereto, granting a perpetual, royalty-free license to the CANVAS Marks and Filings to Seller ("License Agreement")(collectively, the Assignment Agreement and the License Agreement are referred to herein as the "Transaction Documents").

**4.    Recordation.**   From and after the date hereof, each of the Parties to this Agreement shall execute and deliver such additional documents, instruments, conveyances, and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder.

**5.    Additional Trademark Application.**

Seller has filed U.S. Trademark Registration Application Serial No. 90/808,532 for the mark "BLANK BY CANVAS" in Class 35 for "Promoting the goods and services of others; Providing business information via a web site" and Class 41 for "Providing on-line magazines in the field of wellness and well-being, food, wine, agriculture, tourism, hospitality, arts and culture; Providing information in the field of current events via a website; Providing information, news, and commentary in the field of current events via the Internet," (claiming first use as early as June 16, 2021) as well as "Arranging, organizing, conducting, and hosting social entertainment events; Arranging and conducting special events for social entertainment purposes; Organization of events for cultural purposes," (on the basis of intent-to-use).  For the avoidance of doubt, the BLANK BY CANVAS mark and related Application Ser. No. 90/808,532 (and any resulting registration) are not included in the Acquired Rights herein, but shall remain the property of Seller. At Seller's request, Buyer shall take whatever action is reasonably necessary to assist Seller in registering the BLANK BY CANVAS mark with the U.S. Patent and Trademark Office ("USPTO") and/or in perfecting Seller's rights in and to the BLANK BY CANVAS mark, including (if needed) providing a letter of consent to registration.

**6.     Disclaimer of Representations and Warranties by Seller**. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER CONVEYS AND BUYER ACCEPTS THE ACQUIRED RIGHTS "AS IS". SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THE ACQUIRED RIGHTS, OR WITH RESPECT TO SELLER, ITS AFFILIATES, OR THEIR RESPECTIVE FINANCIAL CONDITIONS, ASSETS, LIABILITIES OR OPERATIONS, OR THEIR PAST, CURRENT OR FUTURE PROFITABILITY OR PERFORMANCE OR ANY OTHER MATTER, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES.

**7.     Representations and Warranties of Buyer**. Buyer represents and warrants as follows:

(a)     <u>Existence and Good Standing</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of Delaware and is qualified to do business and is in good standing in every jurisdiction in which such qualification is necessary to conduct its business.

(b)     <u>No Conflicts</u>. The consummation of this Agreement will not breach or violate (i) Buyer's articles of incorporation or bylaws, (ii) any material contract or material agreement to which Buyer is a party or by which it or any of its assets are bound, or (iii) any applicable Law or Governmental Order.

(c)     <u>Disclaimer of Other Representations and Warranties</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER MAKES NO OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO BUYER, ITS AFFILIATES, OR THEIR RESPECTIVE FINANCIAL CONDITIONS, ASSETS, LIABILITIES OR OPERATIONS, OR THEIR PAST, CURRENT OR FUTURE PROFITABILITY OR PERFORMANCE OR ANY OTHER MATTER, AND BUYER HEREBY EXPRESSLY DISCLAIMS ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES.

**8.   Indemnification by Buyer.**

(a)     <u>Indemnification</u>. Buyer hereby agrees to defend, indemnify, and hold Seller, its affiliates and their respective officers, directors, employees, members, managers, agents (including their respective accountants and attorneys), representatives, successors and assigns (each a "Seller Indemnified Party"), harmless of, from and against any and all losses, damages, liabilities, deficiencies, judgments, settlements, awards, penalties, charges, fines, fees, costs, interest and expenses whatsoever, including reasonable attorneys' fees, the costs of enforcing any right to indemnification hereunder, and the cost of pursuing any insurance providers (collectively "Losses") arising out of or in connection with any third-party, claim, suit, action, or proceeding ("Third Party Claim") relating to or based upon Buyer's or Seller's use of the CANVAS Marks.

(b)     Claim Procedure. If a Third Party Claim is asserted against a Seller Indemnified Party for which indemnification may be sought under the provisions of this Section 8, Seller Indemnified Party shall promptly notify Buyer in writing of the Third Party Claim and Buyer shall thereafter undertake the defense of the Third Party Claim, with counsel acceptable to the Seller Indemnified Party, which acceptance will not be unreasonably withheld, conditioned or delayed.  If Buyer does not promptly undertake and actively and diligently conduct the defense of any Third Party Claim hereunder, then Seller Indemnified Party may undertake the defense of the Third Party Claim itself, with counsel of its own choosing, and Buyer shall reimburse Seller Indemnified Party for all reasonable costs and expenses, including court costs and reasonable attorney's fees, incurred by Seller Indemnified Party in defending and resolving the Third Party Claim, which shall be reimbursed  to Seller Indemnified Party promptly within thirty (30) days upon Seller Indemnified Party giving Buyer an invoice for the same. The Parties agree to provide one another with such assistance as the other Party may reasonably request in order to defend, settle or compromise any Third Party Claim, and neither Party shall settle or compromise any Third Party Claim without the consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

**9.      Confidentiality.** Neither Party shall disclose to any third party (other than their respective employees in their capacity as such) this Agreement or any of its terms; except to the extent required to comply with any applicable law, rule, regulation, or any summons, subpoena, or order of court or governmental agency having authority and jurisdiction over a Party; provided, however, that the Transaction Documents may be disclosed by either Party in the exercise of its reasonable business judgment.

**10.     Reversion of Rights.**  Upon (i) Buyer's voluntary abandonment of the CANVAS Marks (which shall be presumed in the event of Buyer's non-use of the CANVAS Marks for a period of over three (3) years); or (ii) Buyer's cessation of use of the CANVAS Marks and Filings pursuant to final order of a court and after exhaustion of all rights to appeal such order; or (iii) termination of this Agreement and/or that certain License Agreement of even date herewith due to the material, uncured breach of Buyer, all rights herein granted to Buyer in the CANVAS Marks and Registration and all of Buyer's goodwill associated therewith shall immediately and automatically revert back, transfer and/or be assigned to Seller, and Buyer shall have no further right to continue to use any CANVAS Marks.

**11. Miscellaneous.**

(a)     Binding Effect. This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and, as applicable, their respective successors and permitted assigns.

(b)     Notices. All notices and communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed effectively given in all respects: (i) when received, if manually delivered; (ii) when received by the addressee if sent by a nationally recognized overnight courier, which maintains records of the time, place and recipient of delivery; (iii) on the date sent by email if receipt of such email is confirmed in writing by recipient; or (iv) upon delivery as reflected in the confirmation if sent by confirmed

facsimile transmission, and in each case if directed to the Party at the address and/or facsimile transmission number set forth below, or to such other address or facsimile transmission designated by any Party in accordance with this Section.

If to Seller, to: Colby Smith, P.O. Box 2267, Yountville, CA 94599, or colby@conciergealliance.com;

If to Buyer, to: Canvas Technologies, Attn: Ben Herman, 543 Moreno Avenue, Los Angeles, CA 90049, or ben@canvas.com.

(c)     <u>Amendments</u>. No modifications or amendments of this Agreement shall be effective unless made in writing and signed by a duly authorized representative of both Seller and Buyer.

(d)     <u>Governing Law; Venue</u>. This Agreement, and all matters arising out of or relating to this Agreement, shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without regard to the conflicts of laws rules thereof. Any lawsuit, action, or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby shall be exclusively instituted in the state Superior courts of Napa County or Sonoma County, California or the federal court located in the California Northern District, irrespective of the fact that such Party is not a resident or qualified to do business in such state or county. By execution and delivery of this Agreement, the Parties irrevocably submit to the jurisdiction of such courts for itself and in respect of its property with respect to such action. The Parties irrevocably agree that venue would be proper in such court, and hereby waive any objection that such court is improper or inconvenient forum for the resolution of such action.

(e)     <u>Entire Agreement</u>. This Agreement, together with the Transaction Documents, embodies the entire agreement and understanding between the Parties hereto and supersedes all prior and contemporaneous oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant, or agreement of any kind not expressly set forth in this Agreement shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement. In the event of any conflict or inconsistency between the terms of the Transaction Documents and this Agreement, notwithstanding the terms of the Transaction Documents, including the merger clause in the License Agreement, the terms of this Agreement shall govern.

(f)     <u>No Reliance.</u> Each Party has made its own independent decisions to enter into this Agreement and the Transactions Documents, and has been represented by its own separate legal counsel, and each Party acknowledges that it has not relied upon any representation or warranty made by the other Party except as expressly provided in this Agreement.

(g)     <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect the enforceability of any other term or provision of this Agreement, or invalidate or render

unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal, or unenforceable, a court may modify this Agreement to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(h) <u>Relationship of the Parties</u>. Nothing contained in this Agreement will be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and neither Party has authority to contract for nor bind the other Party in any manner whatsoever.

(i) <u>No Third-Party Beneficiaries</u>. Except for the right of Seller Indemnified Parties to enforce their indemnification rights under <u>Section 8</u>, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any third party any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

(j) <u>Waivers and Consents</u>. No waiver or consent by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the waiving or consenting Party. Any written waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(k) <u>Headings and Captions</u>. The headings and captions of the various subdivisions of this Agreement are for convenience of reference only and shall in no way modify or affect the meaning or construction of any of the terms or provisions hereof.

(l) <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives to execute this Trademark Acquisition Agreement as of the date first written above.


SELLER

By: _Colby Smith_____
Colby Smith




BUYER

**Canvas Technologies, Inc.**


By: _Ben Herman_____
Ben Herman (Jul 13, 2021 16:14 PDT)
Name: Ben Herman
Title: CEO

<u>**Exhibit A**</u>

**TRADEMARK ASSIGNMENT AGREEMENT**

# TRADEMARK ASSIGNMENT AGREEMENT

This TRADEMARK ASSIGNMENT AGREEMENT (**"Trademark Assignment"**), dated as of July 13, 2021, is made by Colby Smith, a California resident with an address at P.O. Box 2267, Yountville CA 94599 (hereinafter referred to as "Assignor") and Canvas Technologies, Inc., a Delaware corporation having a principal place of business at 55 Second Street, Suite 1925, San Francisco, CA 94105 (hereinafter referred to as "Assignee"). Both Assignor and Assignee are collectively referred to herein as the "Parties."

WHEREAS, Assignor wishes to convey, transfer, and assign to Assignee certain intellectual property of Assignor, and has agreed to execute and deliver this Trademark Assignment;

WHEREAS, Assignee is desirous of acquiring said intellectual property;

NOW THEREFORE, the Parties agree as follows.

1. <u>Assignment</u>. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby irrevocably conveys, transfers, and assigns to Assignor, and Assignor hereby accepts, all of Assignor's right, title, and interest in and to:

      (a) U.S. Trademark Reg. No. 4737811 for the mark CANVAS [CONCIERGE ALLIANCE NAPA VALLEY & SONOMA] (Stylized) in connection with "conducting trade shows in the field of hotel, food service, hospitality, and concierge services; conducting, arranging and organizing trade shows and trade fairs for commercial and advertising purposes; membership club services, namely, providing on-line information to members in the fields of branding, business development, business marketing, and marketing; organizing, promoting and conducting exhibitions, tradeshows and events for business purposes" in Class 35;

      (b) U.S. Trademark Application Serial No. 90/808,387 for the mark CANVAS (Word) in connection with "Providing business information via a web site; Conducting trade shows in the field of hotel, food service, hospitality, and concierge services; Conducting, arranging and organizing trade shows and trade fairs for commercial and advertising purposes; Membership club services, namely, providing on-line information to members in the fields of branding, business development, business marketing, and marketing; Organizing, promoting and conducting exhibitions, tradeshows and events for business purposes," as well as "Employment recruiting services; Employment hiring, recruiting, placement, staffing and career networking services," in Class 35; and "Providing a website featuring technology that enables job applicants to submit applications for employment to companies, and for employers to solicit and accept applications for employment; Providing an interactive website for online recruiting of human resources and for communication among employers and candidates for employment," as well as "Providing a website featuring educational information in field of hotel, food and beverage, hospitality, wineries and concierge services ," in Class 42.

(c)        the trademarks CANVAS, CANVAS (Stylized) , and CANVAS [CONCIERGE ALLIANCE NAPA VALLEY & SONOMA] (Stylized)  (together with the USPTO filings in subsections (a) and (b) above, the "Assigned Trademarks");

(d)        any and all goodwill associated with or symbolized by any of the Assigned Trademarks;

(e)        any and all rights of any kind whatsoever of Assignor accruing under any of the Assigned Trademarks provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world; and

(f)        any and all claims and causes of action with respect to any of the Assigned Trademarks, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2.        Recordation. Assignor hereby authorizes the Commissioner for Trademarks in the United States Patent and Trademark Office to record and register this Trademark Assignment upon request by Assignee.

3.        Counterparts. This Trademark Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Trademark Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Trademark Assignment.

4.        Successors and Assigns. This Trademark Assignment shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

5.        Governing Law. This Trademark Assignment and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based upon, arising out of, or relating to this Trademark Assignment and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of California, without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction).

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Assignor has duly executed and delivered this Trademark Assignment as of the date first written above.

Colby Smith


By: _____

## Exhibit B

## TRADEMARK LICENSE AGREEMENT

# Trademark License Agreement

This Trademark License Agreement ("**Agreement**"), is made and entered into as of this 13th day of July, 2021 ("Effective Date"), by and between Canvas Technologies, Inc., a Delaware corporation having a principal place of business at 55 Second Street, Suite 1925, San Francisco, CA 94105 (hereinafter referred to as "Licensor") and Colby Smith, a California resident with an address at P.O. Box 2267, Yountville CA 94599 (hereinafter referred to as "Licensee"). Both Licensor and Licensee are collectively referred to herein as the "Parties."

WHEREAS, Licensor is the owner of the marks and registrations set forth below in Schedule 1 ("Licensed Marks"); and

WHEREAS, Licensee wishes to obtain, and Licensor is willing to grant to Licensee, a license to use the Licensed Marks in connection with Licensee's services in Class 35 for "Providing business information via a web site; Conducting trade shows in the field of hotel, food service, hospitality, and concierge services; Conducting, arranging and organizing trade shows and trade fairs for commercial and advertising purposes; Membership club services, namely, providing on-line information to members in the fields of branding, business development, business marketing, and marketing; Organizing, promoting and conducting exhibitions, tradeshows and events for business purposes," as well as, "Employment recruiting services; Employment hiring, recruiting, placement, staffing and career networking services"; and in Class 42 for "Providing a website featuring technology that enables job applicants to submit applications for employment to companies, and for employers to solicit and accept applications for employment;  Providing an interactive website for online recruiting of human resources and for communication among employers and candidates for employment," as well as "Providing a website featuring educational information in field of hotel, food and beverage, hospitality, wineries and concierge services"(the "Licensed Services") in the Territory (as defined below) on the terms and conditions set out in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    License.

(a)    Subject to this Agreement's terms and conditions, Licensor hereby grants to Licensee a perpetual, royalty-free, exclusive (except with respect to Licensor and its Affiliates, subsidiaries and related entities), worldwide, non-transferable, and non-sublicensable (except as provided in subsection (b) of this section) license to use the Licensed Marks set forth in Schedule 1 in connection with the Licensed Services in the United States and worldwide (the "Territory"); provided, however, that (i) the license granted in this paragraph shall be exclusive (without exception) with respect to the styled marks set forth in Schedule 1, i.e. (canvas/canvas); Licensor shall not use these stylized designs, nor grant any licenses to third parties to use them; and these stylized designs shall be reserved for use exclusively by Licensee and any sublicensees who are granted sublicenses pursuant to this Agreement; and (ii) Licensor may grant additional licenses to the Licensed Marks with Licensee's written consent. Licensor may

grant up to three (3) additional licenses to its Affiliates, subsidiaries and/or related entities at no further expense. Licensor shall pay to Licensee a "License Offset Fee" in an amount to be agreed upon by the Parties for each additional license or sublicense granted by Licensor to any Affiliates, subsidiaries and related entities. The License Offset Fee will be due and payable to Licensee within thirty (30) days of the Effective Date of such license. No license or rights are granted to Licensee by implication, estoppel, or otherwise, other than as expressly granted by Licensor under this Section. "Affiliate" shall mean a corporation, company, or entity that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with another corporation, company, or entity; and for purposes of this definition only, the term "control" means the power to direct or cause the direction of the management and policies of another corporation, company, or entity, whether through the ownership of voting securities, by contract, or otherwise.

(b)     Sublicense.  Licensee may grant sublicenses under the license granted in Section 1(a) to any entity at Licensee's discretion, with Licensor's written consent not to be unreasonably withheld.  Unless otherwise agreed by the Parties in writing, all sublicenses hereunder must: (A) be subject to and consistent with the applicable terms and conditions of this Agreement; (B) prohibit further sublicensing or assignment to a third party; and (C) terminate automatically effective as of the termination of this Agreement. Licensee shall ensure that each sublicensee complies with the applicable terms and conditions of this Agreement. Any act or omission of a sublicensee that would be a material breach of this Agreement if performed by Licensee will be deemed to be a material breach by Licensee.

2.     Use of the Licensed Marks. The Parties acknowledge and are familiar with the high standards and reputation for quality symbolized by the Licensed Marks as of the Effective Date, and the Parties shall, at all times, conduct their business, provide services to consumers, and use the Licensed Marks in a manner at least consistent with such quality standards and reputation. The Parties shall ensure that all uses of the Licensed Marks under this Agreement comply with all applicable laws. Licensor may exercise quality control over all uses of the Licensed Marks under this Agreement to maintain the validity of the Licensed Marks and protect the goodwill associated therewith. Licensor acknowledges and agrees that all uses of the Licensed Marks made by Licensee as of the Effective Date meet Licensor's quality standards and are hereby deemed approved by Licensor. Approval of any use by Licensee or any sublicensee of the Licensed Marks, once given by Licensor, will continue in effect, without need for future approval, so long as Licensee's or the applicable sublicensee's use of the Licensed Marks in connection with the Licensed Services continues to be substantially consistent with such previously approved use.

3.     Ownership and Protection of the Licensed Mark.

(a)     Acknowledgment. Licensee acknowledges and agrees that, as between the Parties, (i) Licensor owns and will retain all right, title, and interest in and to the Licensed Marks; and (ii) all use by Licensee or any sublicensee of the Licensed Marks under this Agreement, and all goodwill accruing therefrom, will inure to the benefit of Licensor.

(b)     Registration and Maintenance. Licensor shall file, prosecute, and maintain all applications and registrations for the Licensed Marks. Licensee shall provide, at the reasonable request of Licensor and at Licensor's expense, all reasonably necessary assistance with such filing, maintenance, and prosecution.

(c)     Enforcement.

(i)     Each Party shall promptly notify the other party in writing of any actual, suspected, or threatened infringement, dilution, or other conflicting use of the Licensed Marks ("Infringement") by any third party of which it becomes aware.

(ii)     Licensor has the first right, in its discretion, to bring any action or proceeding with respect to any Infringement. Notwithstanding the foregoing, if within 60 days following either party's receipt of a notice provided under Section 3(c)(i), Licensor does not initiate legal action with respect to any Infringement, or if Licensor subsequently decides not to proceed with any such action, and if Licensee has a good faith belief that such Infringement has impaired or will impair the value of the Licensed Marks or otherwise adversely affect its rights under this Agreement, then Licensee shall have the right, but no obligation, to bring or take any such action as it determines is necessary in its reasonable business judgment to halt any such Infringement and to control the conduct of such enforcement action, including settlement.

(iii)     Licensor shall be solely responsible for the expenses of any enforcement action, including attorneys' fees of the Party taking action against an alleged Infringement in accordance with this Section 3 (the "Enforcing Party"), and each Party shall provide such assistance as may be reasonably requested by the other Party, at the Licensor's expense, in connection with any such enforcement action (including being joined as a party to such action as necessary to establish standing). Any monetary recovery resulting from such enforcement action shall first be used to pay the legal expenses of the Enforcing Party and then to reimburse any legal expenses incurred by the other Party in cooperating in such action as requested by the Enforcing Party, and any remaining amounts shall belong solely to the Enforcing Party.

4.     Confidentiality. Neither Party shall disclose to any third party (other than their respective employees in their capacity as such) this Agreement or any of its terms; except as necessary for a reasonable business purpose in the exercise of its reasonable business judgment, and to the extent required to comply with any applicable law, rule, regulation, or any summons, subpoena, or order of court or governmental agency having authority and jurisdiction over a Party.

5.     Representations and Warranties.

(a)     Mutual Representations. Each Party represents and warrants to the other Party that, as of the Effective Date: (i) it has the full right, power, and authority to enter into and perform its obligations under this Agreement; (ii) the execution of this Agreement

by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary action of such Party; and (iii) when executed and delivered by such Party, this Agreement will constitute the legal, valid, and binding obligation of that Party, enforceable against that Party in accordance with its terms.

(b)    EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>SECTION 5</u>, LICENSOR EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT AND THE LICENSED MARKS, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

6.    <u>Indemnification</u>.

(a)    <u>By Licensor</u>. Licensor shall indemnify, defend, and hold harmless Licensee and Licensee's Affiliates, officers, directors, employees, agents, sublicensees, successors, and assigns (each, a "Licensee Indemnified Party") against all losses, liabilities, claims, damages, actions, fines, penalties, expenses, or costs (including court costs and reasonable attorneys' fees) ("Losses") arising out of or in connection with any third-party claim, suit, action, or proceeding ("Third-Party Claim") relating to any Third Party Claim based on the use of the Licensed Marks by Licensee or any sublicensee in accordance with the terms of this Agreement.

(b)    <u>Indemnification Procedure</u>. A Licensee Indemnified Party shall promptly notify Licensor in writing of any Third-Party Claim for which it is entitled to indemnification under this Section. Licensor shall control the investigation and defense of such Third-Party Claim at Licensor's expense. The Licensee Indemnified Party shall provide all assistance reasonably requested by the Licensor, at the Licensor's expense. The Licensor shall not settle any such Third-Party Claim in a manner that adversely affects the rights of the Licensee without the Licensee's prior written consent. The Licensee Indemnified Party may participate in and/or observe the proceedings with counsel of its choice at Licensor's cost and expense.

7.    <u>Limitation of Liability</u>. EXCEPT FOR LICENSOR'S LIABILITY FOR INDEMNIFICATION UNDER <u>SECTION 6</u>, BREACH OF CONFIDENTIALITY UNDER <u>SECTION 4</u>, OR DAMAGES CAUSED BY HARM TO LICENSEE'S REPUTATION, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT OR USE OF THE LICENSED MARKS HEREUNDER, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT, OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.    <u>Term and Termination</u>.

(a)     Term. This Agreement is effective as of the Effective Date and will continue in effect until terminated pursuant to Section 8(b).

(b)     Termination.

(i)     Licensee may terminate this Agreement at any time without cause, and without incurring any additional obligation, liability, or penalty, by providing written notice to Licensor.

(ii)     Either Party may terminate this Agreement on written notice to the other Party if the other Party materially breaches this Agreement and fails to cure such breach within sixty (60) days after receiving written notice of such breach from the non-breaching Party.

(c)     Effect of Termination. Upon the expiration or termination of this Agreement: (i) all rights and licenses granted under this Agreement and all sublicenses granted by Licensee will automatically and immediately terminate; and (ii) Licensee shall be afforded one hundred eighty (180) days within which to cease all use of the Licensed Marks, including use via any sublicensee(s). Expiration or termination of this Agreement will not relieve the Parties of any obligations accruing before the effective date of expiration or termination. For the avoidance of doubt, nothing in this Agreement shall limit any of Licensee's rights under that certain Trademark Acquisition Agreement between the Parties of even date herewith.

9.     Assignment. Licensee may not assign or otherwise transfer any of its rights, or delegate or otherwise transfer any of its obligations, under this Agreement, in each case whether voluntarily, involuntarily, by operation of law, or otherwise, without Licensor's prior written consent, which consent Licensor may not unreasonably withhold or delay, except that Licensee may make such an assignment, delegation, or other transfer, in whole or in part, without the Licensor's consent: (a) to an entity wholly owned by Licensee; (b) to an Affiliate; or (c) in connection with the transfer or sale of all or substantially all of the business or assets of Licensee relating to this Agreement. No delegation or other transfer will relieve Licensee of any of its obligations or performance under this Agreement. Any purported assignment, delegation, or transfer in violation of this Section is void. This Agreement is binding upon and inures to the benefit of the Parties and their respective permitted successors and assigns.

10.     General Provisions.

(a)     Further Assurances. Each Party shall, upon the reasonable request, promptly execute such documents and take such further actions as may be necessary to give full effect to the terms of this Agreement.

(b)     Notices. All notices and communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed effectively given in all respects: (i) when received, if manually delivered; (ii) when received by the addressee if sent by a nationally recognized overnight courier,  which maintains records of the time, place and recipient of delivery; (iii) on the date sent by email if receipt of such email is confirmed in writing by recipient; or (iv) upon delivery as reflected in the confirmation if

sent by confirmed facsimile transmission, and in each case if directed to the party at the address and/or facsimile transmission number set forth below, or to such other address or facsimile transmission designated by any party in accordance with this Section.

If to Licensor, to: Colby Smith, P.O. Box 2267, Yountville, CA 94599, or colby@conciergealliance.com;
If to Licensee, to: Canvas Technologies, Attn: Ben Herman, 543 Moreno Avenue, Los Angeles, CA 90049, or ben@canvas.com.

(c)     Governing Law. This Agreement, and all matters arising out of or relating to this Agreement, shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without regard to any choice or conflict of laws provisions thereof.  Any lawsuit, action, or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby shall be exclusively instituted in the state Superior courts of Napa County or Sonoma County, California or the federal court located in the California Northern District, irrespective of the fact that such party is not a resident or qualified to do business in such state or county. By execution and delivery of this Agreement, the Parties irrevocably submit to the jurisdiction of such courts for itself and in respect of its property with respect to such action. The Parties irrevocably agree that venue would be proper in such court, and hereby waive any objection that such court is improper or inconvenient forum for the resolution of such action.

(d)     Entire Agreement. This Agreement, including and together with Schedule 1, constitutes the sole and entire agreement of Licensor and Licensee with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter, except for that certain Trademark Acquisition Agreement between the Parties of even date herewith.

(e)     Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon a determination that any term or provision is invalid, illegal, or unenforceable, a court may modify this Agreement to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(f)     Relationship of the Parties. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement creates any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and neither Party has authority to contract for or bind the other Party in any manner whatsoever.

(g)     No Third-Party Beneficiaries. Except for the right of Licensee Indemnified Parties to enforce their indemnification rights under Section 6, this Agreement solely benefits the Parties and their respective permitted successors and assigns, and nothing in

this Agreement, express or implied, confers on any other person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

(h)     Amendment; Waiver; Consents. No amendment to this Agreement will be effective unless it is in writing and signed by both Parties. No waiver or consent by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the waiving or consenting Party. Any written waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(i)     Headings and Captions. The headings and captions of the various subdivisions of this Agreement are for convenience of reference only and shall in no way modify or affect the meaning or construction of any of the terms or provisions hereof.

(j)     Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Trademark License Agreement as of the date first written above.

**Canvas Technologies, Inc.**


By:     _____
        Name: Ben Herman
        Title: CEO



**Colby Smith**


By:     _____
        Name: Colby Smith

**SCHEDULE 1**

**Licensed Marks**

- **CANVAS (Word)**

- **CANVAS (Stylized)** 

- **CANVAS [CONCIERGE ALLIANCE NAPA VALLEY & SONOMA] (Stylized)**
  

- **U.S. Trademark Reg. No. 4737811 for the mark CANVAS [CONCIERGE ALLIANCE NAPA VALLEY & SONOMA] (Stylized)**

- **U.S. Trademark Application Serial No. 90/808,387 for the mark CANVAS (Word)**