Sterling A. Brennan (UT Bar No. 10060)
sbrennan@mabr.com
MASCHOFF BRENNAN
GILMORE & ISRAELSEN, PLLC
111 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 297-1850

Peter J. Willsey (Admitted Pro Hac Vice)
pwillsey@brownrudnick.com
Vincent J. Badolato (Admitted Pro Hac Vice)
vbadolato@brownrudnick.com
BROWN RUDNICK LLP
601 Thirteenth Street NW, Suite 600
Washington, D.C. 20005
Telephone: (202) 536-1700

Jason M. Sobel (Admitted Pro Hac Vice)
jsobel@brownrudnick.com
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800

Stephanie P. Calnan (Admitted Pro Hac Vice)
scalnan@brownrudnick.com
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200

Attorneys for Defendant/Counterclaim-Plaintiff
CANVAS TECHNOLOGIES, INC.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| INSTRUCTURE, INC., a Delaware corporation,<br><br>        Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>CANVAS TECHNOLOGIES, INC., a Delaware corporation,<br><br>        Defendant/Counterclaim-Plaintiff. | Civil No. 2:21-cv-00454-DAK-CMR<br><br>**CANVAS TECHNOLOGIES, INC.'S RESPONSE TO ORDER TO SHOW CAUSE**<br><br>District Judge: Hon. Dale A. Kimball<br>Magistrate Judge: Hon. Cecelia M. Romero |

**TABLE OF CONTENTS**

**Page**

I. FACTUAL BACKGROUND ............................................................................. 1
II. ARGUMENT ..................................................................................................... 6
III. CONCLUSION ................................................................................................ 10

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bad Ass Coffee Co. of Hawaii v. Bad Ass Coffee Ltd. P'ship*,
    95 F. Supp. 2d 1252 (D. Utah 2000) .................................................................................9, 10

*Bauchman v. W. High Sch.*,
    906 F. Supp. 1483 (D. Utah 1995) ........................................................................................ 7

*Li v. Lewis*,
    No. 1:20-CV-12 TS-JCB, 2020 WL 3271924 (D. Utah June 17, 2020) ............................... 7

*Mint Solar, LLC v. Savage*,
    No. 2:18-CV-569 TS, 2018 WL 4208078 (D. Utah Sept. 4, 2018) ................................. 7, 10

*Reliance Ins. Co. v. Mast Constr. Co.*,
    159 F.3d 1311 (10th Cir. 1998) ............................................................................................ 7

*Sara Lee Corp. v. Sycamore Fam. Bakery Inc.*,
    No. 2:09CV523DAK, 2011 WL 1807779 (D. Utah May 12, 2011) ..................................... 9

**Other Authorities**

Fed. R. Civ. P. 70 .............................................................................................................................. 6

Defendant/Counterclaim-Plaintiff Canvas Technologies, Inc. ("Canvas") hereby responds to the Court's Order to Show Cause (ECF No. 88) to explain why Canvas should not be held in contempt of the Court's Order Granting Preliminary Injunction (ECF No. 74) (the "PI Order").

## I.  FACTUAL BACKGROUND

On January 5, 2022, the Court issued its PI Order requiring Canvas to stop using the CANVAS mark by January 20, 2022, only 15 days from the entry of the PI Order. The next day, on January 6, 2022, Canvas filed a Notice of Appeal (ECF No. 75) and on January 7, 2022, Canvas filed an Emergency Motion to Stay the Injunction Pending Appeal (ECF No. 79). On January 19, 2022, Canvas filed a Motion to Expedite its Emergency Motion to Stay (ECF No. 83) and, later that day, the Court granted Canvas's Motion to Expedite but denied Canvas's Motion to Stay (ECF No. 84). On January 20, 2022, Canvas filed an Emergency Motion to Stay in the Tenth Circuit, which was denied on February 4, 2022.

In addition to pursuing every available judicial avenue, Canvas immediately began taking significant steps to comply with the PI Order. Within hours of entry of the PI Order, Canvas engaged in discussions with counsel and strategized internally on a plan to rebrand. Gefkovicz Decl., ¶ 11.[1] The day after the PI Order, Canvas instructed its counsel to conduct trademark clearance searches on possible new brands. *Id.*, ¶ 12. Since entry of the PI Order, Canvas's primary focus has been on selecting a new company name, and the company has been in daily contact with counsel on rebranding and trademark clearance strategies. *Id.*, ¶ 13. ██████████████████████████████████████████████████████████████. *Id.*

While senior company management and outside counsel were diligently pursuing a rebrand, Canvas also assembled an internal team consisting of members from its engineering

---

[1] References to "Gefkovicz Decl." are to the declaration of Adam Gefkovicz submitted herewith.

product and design ("EPD") and go-to-market ("GTM") teams to create and execute a plan to comply with the PI Order. *Id.*, ¶ 14. Phase 1 of the plan focuses on compliance with the PI Order and includes two sub-phases: ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████ *Id.*, ¶ 15. Phase 1 reflects Canvas's urgent effort to remove all references to CANVAS and replace them with its new company name as quickly as possible. *Id.*

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ *Id.*, ¶ 16. While Phase 1 prioritizes speed over quality, Phase 2 is a more methodical rebranding process that will allow Canvas to solidify a new brand identity, focusing on all visual aspects and finer strategic details including color schemes, designs, animations, and messaging. *Id.*

    Canvas's detailed written plan for the rebrand to comply with the PI Order consists of three fundamental categories – (i) marketing, (ii) product, and (iii) compliance/legal. *Id.*, ¶ 17. Each category requires an assessment of whether or not a task is dependent on the selection of the new name, whether or not the team is equipped to start work on the task, and who is responsible for the work. *Id.* "Live links" were created so that team members could work simultaneously and collaboratively while updating the status of tasks and noting progress. For example, engineering managers of the EPD team worked in Asana boards (an electronic collaborative work tool) to optimize efficiency. *Id.* Canvas also created private channels on Slack, an intracompany communications system, in which team members provide daily updates and detail steps taken to advance the rebrand plan. *Id.*

Canvas has also meticulously identified all content requiring a rebrand such as automatically generated emails, including marketing and operational emails to both candidates and recruiters and links to blogs, sales material, and podcasts. *Id.*, ¶ 18. For some marketing content, Canvas has replaced references to CANVAS with generic language that is not specific to a new company name. By January 20, 2022, the marketing team had manually removed references to CANVAS in 129 blogs,[2] a time-intensive process that took over two full working days to complete.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████. *Id.*, ¶ 19.

Anticipating that securing a new company name would not be immediate, Canvas identified "pre-work" tasks that were dependent on a new company name and logo, ██████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████. *Id.*, ¶¶ 20, 21. Canvas "scoped" (i.e., detailed each step and responsibility for each step to a team member) "pre-work" tasks and instructed team members to get started on them immediately. *Id.*, ¶ 21. ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████. *Id.*, ¶ 22. ████████████████████

███████████████████████████████████████████████. *Id.*

---

[2] Exclusive of the name CANVAS in the top banner, which can be quickly switched once a new company name is finalized.

3

███████████████████████████████████████████████

███████████████████████████████████████████████ *Id.*, ¶ 23.

By January 25, 2022, Canvas had replaced references to CANVAS with generic language not specific to a new company name on its public-facing website as follows (prior use of the term "Canvas" is highlighted for ease of reference):




**As of August 2021**        **As of January 25, 2022**



**As of August 2021**



4



**As of August 2021**



**As of January 25, 2022**[3]

Simply reverting to Canvas's former company name, Jumpstart Ventures, Inc. ("Jumpstart") has never been a viable option ▮▮▮▮▮▮. *Id.*, ¶ ▮▮▮▮

▮▮▮▮ Moreover, all of the technical work detailed above that Canvas is currently conducting would be necessary even if Canvas were to revert to Jumpstart. ▮▮▮▮

▮▮▮▮ *Id.* The capabilities of Canvas's current product have advanced such that the product structure is now incomparable to Canvas's prior product version when it operated as Jumpstart. Put simply, no Jumpstart product exists that the company can reuse. *Id.* Additionally, the Court's suggestion that Canvas should simply stop re-directing the public from jumpstart.me to canvas.com is not practically feasible because

---

[3] *See* Gefkovicz Decl., ¶ 24 (including additional examples of Canvas's live website where references to "Canvas" have been replaced with generic language).

5

consumers are no longer visiting jumpstart ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, ¶ 27. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

*Id.*, ¶ 29. "Domain warming," which typically takes at least 30 days, is a process by which emails from new domain names are "warmed up" (i.e., familiarized) such that they are not caught in users' spam filters. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*

As the above discussion demonstrates, and contrary to Instructure's characterization, (Mot. (ECF No. 86) at 3), it has been far from "business as usual" at Canvas in the wake of the PI Order.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Working diligently every business day, weekend, and holiday (including MLK Day, an important holiday for Canvas given its mission of diversity, equity, and inclusion) since entry of the PI Order, Canvas has expended significant time and monetary resources to do all that is possible to comply with the PI Order and will continue to do so until the rebrand process is completed. *Id.*, ¶ 30.

## II. ARGUMENT

Where "a judgment requires a party . . . to perform any other specific act and the party fails to comply within the time specified . . . the court may also hold the disobedient party in contempt." Fed. R. Civ. P. 70. "To prevail in a civil contempt proceeding, the plaintiff has the burden of

6

proving, by clear and convincing evidence, that a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order." *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998) (internal citation omitted). "Defendants may assert a defense to civil contempt by showing by clear and convincing evidence that 'all reasonable steps' were taken in good faith to ensure compliance with the court order and that there was substantial compliance, or relatedly by proving 'plainly and unmistakably' defendants were unable to comply with the court order." *Bauchman v. W. High Sch.*, 906 F. Supp. 1483, 1494 (D. Utah 1995) (internal citations omitted) (defendants not in contempt of court where "there was clear and convincing evidence to the effect that defendants took all reasonable steps to insure compliance with the injunction and that they all acted in good faith to achieve substantial compliance with the injunction"); *see also Li v. Lewis,* No. 1:20-CV-12 TS-JCB, 2020 WL 3271924, at *1 (D. Utah June 17, 2020) *(*"It is also a defense to a civil contempt claim if the defendant takes all reasonable steps and substantially complies with the court order."); *Mint Solar, LLC v. Savage*, No. 2:18-CV-569 TS, 2018 WL 4208078, at *1 (D. Utah Sept. 4, 2018) (defendants took all reasonable steps and substantially complied with the court's order even though it failed to meet the deadline of compliance set forth in the order and, by the time of the court's decision, had fully complied with the order, "thereby absolving them of their contempt").

      As discussed above, Canvas has taken, and continues to take, significant and burdensome steps to comply with the PI Order. Canvas acted within hours of receiving news of the Court's PI Order, immediately began strategizing with counsel to select a new company name and assembled an internal team to create and execute a detailed plan to comply with the PI Order. Gefkovicz Decl., ¶¶ 11-14. These internal efforts have included: (i) identifying step-by-step tasks that were dependent on the new company name; (ii) performing "pre-work" to effectively and efficiently

7

prepare the company's operations and product for implementation of the eventual new company name; (iii) ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████ and (v) replacing the term CANVAS with generic language not specific to a new company name on its public-facing website. *Id.*, ¶¶ 17, 21-24. In sum, Canvas has worked around the clock to comply with the PI Order and will continue to do so until a viable new company name has been selected and implemented. *Id.*, ¶ 30.

Further, the idea that Canvas could easily revert to Jumpstart is simply not an available solution. Significantly, no version of a website with the name Jumpstart exists to which Canvas could revert, *id.*, ¶ 25, and all of the technical work detailed above is necessary whether Canvas chose to use the name Jumpstart or rebrand to a new name. Canvas's current product offering has developed to such an extent that it is not comparable to Canvas's older product version offered under the name Jumpstart. *Id.* The dynamic nature of Canvas's product means that reverting to Jumpstart, specifically the domain jumpstart.me, would actually require significantly more work than redirecting to an entirely new brand. *Id.*, ¶ 26. ████████████████████████ ████████████████████████████████ stopping the redirect from that website to canvas.com is neither practical nor meaningful. *Id.*, ¶ 27.

Moreover, not only has Canvas taken reasonable steps and acted in good faith in its efforts to comply with the PI Order, but the short 15-day period to implement an entire company rebrand was "plainly and unmistakably" impossible to comply with from the beginning. Even Canvas's recent rebrand from Jumpstart to Canvas, which was on an aggressive timeline, required four to five months of intensive work. *Id.*, ¶ 8.

8

The cases cited by Instructure finding defendants in contempt of court are distinguishable. In each case, the defendants' businesses and products were of a nature where a rebrand was much simpler and could have been accomplished in a much shorter time frame. *See, e.g., Bad Ass Coffee Co. of Hawaii v. Bad Ass Coffee Ltd. P'ship*, 95 F. Supp. 2d 1252, 1256 (D. Utah 2000) (defendant took over a month from court order to rebrand brick and mortar stores); *Sara Lee Corp. v. Sycamore Fam. Bakery Inc.*, No. 2:09CV523DAK, 2011 WL 1807779, at *3 (D. Utah May 12, 2011) (defendants held in contempt for switching to old versions of non-compliant bread packaging containing infringing trademark after running out of compliant non-infringing packaging). Unlike the products at issue in *Bad Ass Coffee* and *Sara Lee*, where rebranding the physical products at issue would have been relatively simple, Canvas's product consists of a dynamic website and extensive electronic communications and services that are not easily relabeled. As the extensive steps required for Canvas's rebrand detailed above demonstrate, compliance with the PI Order cannot be accomplished simply by sticking a new product label on Canvas's services. Whereas the compliance efforts of the defendants in the cases cited by Instructure were found to be unreasonable, the same cannot be said of Canvas's efforts here.

Finally, even if the Court finds that Canvas is in contempt of Court (which it should not), the Court should not impose sanctions. "Sanctions for civil contempt may only be employed for either or both of two distinct remedial purposes: '(1) to compel or coerce obedience to a court order . . . ; and (2) to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance[.]'" *Bad Ass Coffee*, 95 F. Supp. 2d at 1256 (*quoting O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992)). Neither remedial purpose applies in this case.

First, Canvas has substantially complied with, and continues to take significant measures to ultimately satisfy, the PI Order, making coercive sanctions unnecessary here. *See id.* at 1257 (declining to impose coercive sanctions where defendants had substantially complied with the preliminary injunction). This is not a case in which the defendant has ignored or made only half-hearted efforts to comply with an injunction; indeed, Canvas has worked (and continues to work) around the clock to comply with the PI Order. Second, with respect to compensatory damages, "the amount of the fine must be based upon the complainant's actual losses sustained as a result of the contumacy." *Mint Solar*, 2018 WL 4208078, at *2 (quoting *O'Connor*, 972 F.2d at 1211). Instructure has failed to put forth *any* evidence of actual harm sustained as a result of Canvas's use of the CANVAS mark, making an award of compensatory damages inappropriate. Further, prior to the filing of Instructure's motion for contempt, counsel for Canvas clearly conveyed to Instructure's counsel that Canvas was making diligent efforts to comply with the PI Order and offered to speak further about those efforts. Instructure's counsel declined that offer and instead chose to file the present motion. To the extent Instructure argues that it should now be compensated for its attorneys' fees and costs in bringing this motion, those costs could have been avoided. *Id.* (declining to impose sanctions because "[w]hile the Court appreciates Plaintiffs' frustration with Defendants' failure to timely comply, it appears that this issue could have been quickly and easily resolved without the need for Court intervention.").

### III. CONCLUSION

For the foregoing reasons, Canvas respectfully requests that the Court exercise its discretion and find that Canvas is not in contempt of Court and, even if the Court were to find that Canvas is in contempt, not impose any sanctions on Canvas.

Dated: February 4, 2022                           Respectfully submitted,

*/s/ Peter J. Willsey*
Peter J. Willsey (*pro hac vice*)
Vincent J. Badolato (*pro hac vice*)
Jason M. Sobel (*pro hac vice*)
Stephanie P. Calnan (*pro hac vice*)
BROWN RUDNICK LLP
pwillsey@brownrudnick.com
vbadolato@brownrudnick.com
jsobel@brownrudnick.com
scalnan@brownrudnick.com


*/s/ Sterling A. Brennan*
Sterling A. Brennan (UT Bar No. 10060)
MASCHOFF BRENNAN
GILMORE & ISRAELSEN, PLLC
sbrennan@mabr.com


Attorneys for Defendant/Counterclaim-Plaintiff
CANVAS TECHNOLOGIES, INC.

## **CERTIFICATE OF SERVICE**

    I hereby certify that on the 4th day of February 2022, a true and correct copy of the foregoing document was served on counsel of record via CM/ECF.


                                                 */s/ Sterling A. Brennan*
                                                 Sterling A. Brennan